UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA PRINCE,<br><br>    Plaintiff,<br><br>  v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security<br><br>    Defendant. | No. 2:16-cv-2404-EFB<br><br><br>ORDER |

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties have filed cross-motions for summary judgment and for the reasons discussed below, plaintiff's motion for summary judgment is denied and the Commissioner's motion is granted.

I.    Background

Plaintiff filed applications for a period of disability, DIB, and SSI, alleging that she has been disabled since January 31, 2012. Administrative Record ("AR") 205-21. Plaintiff's applications were denied initially and upon reconsideration. *Id.* at 129-33, 138-44. On November 6, 2014, a hearing was held before administrative law judge ("ALJ") Bradlee S.

1

Welton. *Id.* at 33-73. Plaintiff was represented by counsel at the hearing, and plaintiff, her sister, and a vocational expert testified. *Id.*

On March 4, 2015, the ALJ issued a decision finding that plaintiff was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Act.[1] *Id*. at 17-28. The ALJ made the following specific findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2015 (Exhibit 4D/1).

2. The claimant engaged in substantial gainful activity during the following periods: 2nd quarter of 2013 and some months of 2012 (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq*. Supplemental Security Income ("SSI") is paid to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq*. Under both provisions, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. *See* 20 C.F.R. §§ 423(d)(1)(a), 416.920 & 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Yuckert*, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

\* \* \*

3. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4. The claimant has the following severe impairments: bipolar disorder and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

\* \* \*

5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

\* \* \*

6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can perform simple, repetitive, routine tasks in a low stress job environment requiring only occasional decision-making, only occasional changes in the work setting, and only occasional requirements for exercising judgment, with no fast-paced production rate work, with no interaction with the public and only occasional interaction with coworkers, but no tandem tasks; and the claimant may miss one day of work per month due to interference from psychological symptomatology.

\* \* \*

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

\* \* \*

8. The claimant was born [in] 1984 and was 27 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

* * *

    12. The claimant has not been under a disability, as defined in the Social Security Act, from January 31, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

*Id.* at 19-27.

Plaintiff's request for Appeals Council review was denied on August 3, 2016, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-4.

## II.   Legal Standards

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). ECF No. 13 at 15-22.

## III.   Analysis

Plaintiff argues that the ALJ erred (1) in evaluating the medical opinion evidence, and (2) by rejecting her testimony and third-party statement absent sufficient reasons. ECF No. 11 at 11-19.

A.   The ALJ Properly Weighed the Medical Opinion Evidence

Plaintiff first argues that the ALJ erred by rejecting the opinion of examining physician Dr. Troy Ewing in favor of the mental status examination findings of plaintiff's treating physician Dr. Gordon and Nurse Practitioner Castillo. ECF No. 11 at 11-16.

1.   Relevant Legal Standards

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id*.; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating or examining medical professional may be rejected for "specific and legitimate" reasons that are supported by substantial evidence. *Id*. at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (e.g., supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). However, "[w]hen an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'" *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).

2.   Background

a.   Plaintiff's Mental Health Treatment Record

Plaintiff received an initial psychiatric evaluation through the Sacramento County Drug Court in February 2012. AR 346-348. At that time, plaintiff complained of recurrent flashbacks of her childhood, irritability, anger, difficulty interacting with groups, hyperactivity, and chronic

5

insomnia. *Id*. at 346. She reported never feeling safe, distrusting others, and feeling depressed and anxious, with her anxiety more predominant. *Id*. Dr. Lynn Yen diagnosed plaintiff with methamphetamine dependence and post-traumatic stress disorder ("PTSD") and prescribed Celexa and Seroquel. *Id*. Dr. Yen also recommended lab work be performed but plaintiff declined, explaining that she would follow up with her primary care provider. *Id*.

Plaintiff was seen again by Dr. Yen the following month. *Id*. at 347. Plaintiff complained of a labile mood; intense agitation when around groups, which included pacing and acting hostile and irritable; and difficulty sleeping. *Id*. She appeared depressed, irritable, labile, and tearful, but also acted overly friendly. *Id*. Her thought content included grandiose perception and themes of chaos, while her thought process was tangential and difficult to redirect. Dr. Yen concluded that plaintiff appeared to be in a "mixed episode." *Id.* Dr. Yen noted that it was unclear whether it was drug induced or resulting from bipolar disorder, but suggested it was likely the latter. *Id*. She diagnosed plaintiff with bipolar I disorder, current episode mixed without psychotic features, and prescribed Trileptal and Seroquel and ordered blood work. *Id*. Dr. Yen was reluctant to prescribe Clonazepam and noted that she could not prescribe Propranolol as plaintiff had relapsed on cocaine and methamphetamines. *Id*. At an appointment two weeks later, plaintiff's symptoms had generally stabilized, but she continued to appear depressed and guarded, and her grandiose perception persisted. *Id*. at 348. Dr. Yen concluded that plaintiff's symptoms were more suggestive of bipolar disorder than drug related. She continued plaintiff's Seroquel, increased plaintiff's Trileptal due to persistent mood symptoms, and again ordered blood work. *Id*.

At the next appointment, which was in April 2012, plaintiff had dramatic expressions; an intense gaze; and loud, emphasized, and pressured speech with rambling. *Id*. at 369. She was depressed, labile, easily tearful, but not irritable. *Id*. Her grandiose perception persisted, but her thought process was linear and goal directed. *Id*. Plaintiff admitted that she had not increased her medication as directed due to a fear of side effects. *Id*. After discussing the matter with Dr. Yen, plaintiff agreed to increase her medication and to monitor for side effects. *Id*. Dr. Yen concluded that plaintiff's symptoms were more suggestive of "rapid cycler" than mixed episode. *Id*. She also noted that plaintiff had not had any blood work performed. *Id*.

In May 2012, plaintiff's symptoms were largely unchanged, although plaintiff reported that her medication was helping a little with her anxiety. *Id*. at 368. However, plaintiff again failed to increase her medication and relapsed on drugs. *Id*. She also refused to have lab work performed. *Id*. Dr. Yen declined to further increase plaintiff's medication due to plaintiff's failure to obtain labs, and instead prescribed Lithium. She also order lab work be performed in one week to assess Lithium levels and notified plaintiff to make a follow up appointment after she obtained her blood work. *Id*. Plaintiff was next seen in July 2012. *Id*. at 367. Plaintiff's symptoms were unchanged and she reported her belief that people were judging and misunderstanding her. *Id*. However, Dr. Yen noted that plaintiff had failed to pick up her medication and that plaintiff's primary limitation was following through with instructions. *Id*.

Plaintiff's next treatment records are from August 2013, at which time she was receiving services from the El Hogar clinic. *Id*. at 362. Plaintiff complained of feeling depressed, anxious, worried, nervous, devastated, scared, uncomfortable, and feeling as if something terrible was going to happen. *Id*. She was diagnosed with bipolar disorder, PTSD, and amphetamine dependence (*id*. at 358) and prescribed Zoloft and Benadryl (*id*. at 366). She was also directed to participate in group counseling for her bipolar disorder and chemical dependency (*id*. at 362), and to follow up in 4-6 weeks (*id*. at 366).

Plaintiff was next seen in February 8, 2014. *Id*. at 360. She reported avoiding being in public because it increased her anxiety. *Id*. She denied symptoms of hypomania, insomnia, and severe depression. *Id*. On exam, she was calm, her thoughts were linear, there were no delusional ideations, and her judgment and insight were grossly intact. *Id*. She reported that she started taking Lithium after running out of Zoloft. *Id*. Her physician, Dr. Daniel Gordon, prescribed Lithium and Zoloft, provided plaintiff a form to obtain routine labs and to check Lithium levels, and directed plaintiff to return in one month. *Id*.

However, plaintiff was not seen again until April 15, 2014, at which time she reported severe anxiety and feeling devastated. *Id*. at 361. On exam, her mood was anxious, affect was anxious and depressed, thought process was racing, and she was agitated with feelings of consistently needing to do things. *Id*. Her physician continued Lithium, increased Zoloft, and

7

prescribed Seroquel for insomnia. *Id*. Plaintiff's physician also ordered labs and directed plaintiff to return in 4 weeks. *Id*.

Plaintiff was next seen on June 6, 2014, by Gabriel Castillo, a Nurse Practitioner with the El Hogar clinic. *Id*. at 383. Plaintiff reported that she had self-discontinued all medications because she had been taking them for two years and "they don't work." *Id*. She was easily irritated, tangential, argumentative and demanding, and her speech was rapid and pressured. *Id*. She demanded "benzos" and was described as "very gamey." *Id*. Although she denied use of street drugs, drug use could not be ruled out. *Id*. It was also noted that her file did not contain any lab work. *Id*. Plaintiff agreed to return in 5 days after having lab work completed. *Id*.

Plaintiff did not return in 5 days, but instead was seen next by Mr. Castillo on July 7, 2014.[2] *Id*. at 384. At that time, her presentation was more far more controlled and appropriate. *Id*. She reported "picking up lithium and trying some on her own." *Id*. She also acknowledged needing help. *Id*. She was assessed with bipolar mania v. substance abuse, prescribed Lithium and Abilify, and directed to have lab work, which she had again failed to complete. *Id*.

Plaintiff's last treatment record is dated August 21, 2014, at which time she was seen again by Mr. Castillo. *Id*. at 385. Plaintiff reported that she self-discontinued her Abilify due to akathisia (restlessness). She also expressed problems with mood instability, including issues with depression, anger, anxiety, racing thoughts, losing her temper, and becoming easily agitated. *Id*. Although her mood was somewhat irritable, she was generally euthymic. *Id*. Her rapport was good, speech and appearance were within normal limits, affect was congruent, and thought content and process were logical, linear, and coherent. *Id*. Despite plaintiff's subjective complaints, it was noted that she continued to demonstrate improved mood stability and was generally controlled and appropriate during the appointment. *Id*. However, plaintiff was described as manipulative and "gamey," and it was noted that she demanded Klonopin approximately 6 times during the appointment. *Id*. She was prescribed Lithium and a trial of
/////

---

[2] Plaintiff made an appointment for June 10, 2014, but failed to keep that appointment. AR 388.

8

Depakote and directed to return in one month. However, there are no medical records reflecting further treatment.[3]

b. <u>Medical Opinion Evidence</u>

In July 2012, plaintiff underwent a comprehensive psychiatric evaluation, which was performed by examining physician Dr. Richard Hicks, M.D. *Id*. at 351-354. Plaintiff reported difficulty sleeping and being around other people. *Id*. at 31. She stated that she has strong feelings that people are against her and talk about her, which makes her feel uncomfortable. *Id*. at 31-32. She also reported using drugs in her early adolescence, but denied having used drugs or alcohol in many years. *Id*. at 32. On mental status examination, plaintiff's mood was depressed and fearful, and her affect was blunted and restricted. *Id*. at 352-53. She reported delusions of people trying to hurt her and a history of auditory and visual hallucinations, which have been helped, but not controlled, by medication. *Id*. at 353. Dr. Hicks diagnosed plaintiff with a schizoaffective disorder with bipolar issues, PTSD, and noted that she needed more medication. *Id*. at 354. It was Dr. Hicks' opinion that plaintiff could perform only simple tasks and follow only simple instructions. *Id*. He further opined that under her current medication, plaintiff's ability to interact with coworkers and the public would be limited and her consistency and regularity would be somewhat unpredictable. *Id*.

In December 2014, Dr. Troy Ewing, Psy.D., an examining medical source, performed a mental health status evaluation. AR 389-95. At the evaluation, plaintiff complained of symptoms of depression, manic moods, history of methamphetamine dependency, and PTSD. *Id*. at 390. On examination, she was slightly guarded and agitated. *Id*. at 392. She had an anxious and irritable mood with congruent affect. *Id*. at 393. Her insight was intact and thought process was linear and logical, but she reported experiencing auditory hallucinations almost daily. *Id*. Dr. Ewing diagnosed plaintiff with Schizoaffective disorder, bipolar type; amphetamine dependency in full remissions; and PTSD, chronic. *Id*. He concluded that plaintiff's prognosis was poor to

---

[3] Plaintiff testified at the administrative hearing in November 2014 that she was currently receiving mental health treatment. AR 48-51. Although plaintiff's counsel represented to the ALJ that he would obtain records of such treatment (*id*. at 49), the administrative record does not contain any medical records dated after August 2014.

9

fair at best with continued comprehensive mental health services. *Id*. He opined that plaintiff was moderately to markedly limited in her ability to: maintain regular attendance in the workplace, complete a normal workday or workweek without interruption from her psychiatric condition, interact with coworkers and the public, and deal with the usual stresses encountered in a competitive work environment. *Id*. at 393-94. Dr. Ewing further opined that plaintiff was moderately limited in her ability to perform work activities on a consistent basis and without special or additional supervision. *Id*. He also concluded that plaintiff may need repetition of instruction and supervision to assist with carrying out complex tasks. *Id*. at 393.

The record also contains opinions from two non-examining sources, Dr. Patrice Solomon, Ph.D. and Dr. Timothy Schumacher, Ph.D. Both physicians opined that plaintiff was moderately limited in a number of functional areas, but concluded that she maintained the ability to perform simple tasks in a nonpublic work environment. *Id*. at 80-83, 91-94, 105-109, 117-121.

### 3. ALJ's Determination

In assessing plaintiff's residual functional capacity ("RFC"), the ALJ accorded little weight to Dr. Ewing's opinion. *Id*. at 25. The ALJ noted that at the time of Dr. Ewing's evaluation, plaintiff was not compliant with her medications. *Id*. The ALJ further observed that during the evaluation plaintiff misrepresented the extent of her work history, thereby giving Dr. Ewing the impression that she was more disabled than she actually was. *Id*. at 25-56. The ALJ also noted that Dr. Ewing's opinion was based on a one-time evaluation. *Id*. at 26.

The ALJ concluded that greater weight should be given to plaintiff's treatment records. In that regard, the ALJ accorded great weight to the mental status examination finding of Dr. Gordon and Mr. Castillo, noting that their treatment records reflect plaintiff's mental status when compliant with her medication.[4] *Id*. at 25.

/////

/////

/////

---

[4] The ALJ also gave "some weight" to Dr. Hicks' opinion. AR 25. Plaintiff does not challenge the ALJ's treatment of Dr. Hicks' opinion.

10

4. <u>Discussion</u>

Because Dr. Ewing's opinion was contradicted by the other medical opinions of record, the ALJ was required to provide specific and legitimate reasons for rejecting his examining opinion. *Lester*, 81 F.3d at 830. In this case, the ALJ satisfied that standard.

First, the ALJ properly noted that plaintiff was not compliant with her medications at the time of Dr. Ewing's evaluation. Dr. Ewing specifically observed that plaintiff's Lithium prescription had been discontinued after she missed an appointment and that she was awaiting another appointment to obtain a refill. *Id*. at 390. Plaintiff does not dispute that she was not taking her Lithium at the time of the evaluation, but argues that there is no basis in the record for assuming Dr. Ewing's opinion would have changed had she been taking her medication. ECF No. 11 at 12. She notes that Dr. Ewing found that her prognosis was fair to poor at best even with continued comprehensive mental health services, which, according to plaintiff, indicates that Dr. Ewing did not believe her limitations would change significantly with medications. *Id*.

Plaintiff's argument ignores evidence showing that plaintiff demonstrated improvement with Lithium. At the time plaintiff saw Dr. Gordon in February 2014, she was taking Lithium. AR 360. Although plaintiff stated that she avoided leaving her house due to anxiety, she denied symptoms of hypomania, insomnia, and severe depression and it was noted that she was calm, her thoughts were linear, there were no delusional ideations, and her judgment and insight were grossly intact. *Id*. In contrast, treatment records from when plaintiff was off Lithium show significantly worse symptoms. Most notably, in June 2014—when plaintiff was first seen by Mr. Castillo—she had stopped taking all medication and presented with manic behavior. *Id*. at 383. She was easily irritated, tangential, argumentative, and demanding. *Id*. Her speech was rapid and pressured, and she reported rapid mood swings. *Id*. By the time of her appointment the following month, plaintiff had resumed taking Lithium and appeared far more controlled and appropriate. *Id*. at 384. A treatment record from August 2014 also reflects that plaintiff continued "to demonstrate improved mood stability and is generally controlled and appropriate," despite self-discontinuing her Abilify. *Id*. These treatment records reflect that plaintiff's mental impairments
/////

11

were greatly improved by Lithium, which she was not taking at the time of Dr. Ewing's assessment.

Plaintiff also argues that the ALJ failed to consider her reason for not taking her medication, noting that she reported not liking Lithium, Depakote, Seroquel because she "feel these meds are too strong." ECF No. 11 at 12 (citing AR 362). Plaintiff appears to suggest that there was good reason for her not taking Lithium at the time she was evaluated by Dr. Ewing. The argument is not well taken. The record clearly establishes that plaintiff stopped taking Lithium prior to Ewing's evaluation because she missed a medical appointment, an all too common occurrence for plaintiff. AR 390. Moreover, plaintiff specifically represented to Dr. Ewing that she was attempting to get an appointment to refill her Lithium, indicating her intention to resume the medication. *Id*. Moreover, plaintiff specifically denied any side effects from Lithium. *Id*. at 384. Thus, she did not cease taking the medication due to it feeling "too strong."

Accordingly, the ALJ logically concluded that Dr. Ewing's opinion did not accurately reflect plaintiff's functional limitations due plaintiff's lack of medication compliance at the time of the evaluation.[5] *See Marci v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) ("[T]he ALJ is entitled to draw inferences logically flowing from the evidence.") (quotations omitted); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) ("The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record . . . .") (quotations omitted).

/////

/////

---

[5] Dr. Ewing also found that plaintiff's medications at the time of the evaluation included Abilify, but only noted that plaintiff was awaiting a refill on Lithium. AR 390. Assuming plaintiff reported to Dr. Ewing that she was taking Abilify, it is not clear how she would have obtained the medication as Mr. Castillo discontinued her Abilify in August 2014—four months prior to Dr. Ewing's evaluation—and there are no subsequent treatment records. Plaintiff initially conceded that she was not taking Abilify in her motion for summary judgment. ECF No. 11 at 12 ("As noted above, Ms. Prince had stopped taking Abilify due to the side effects."). However, she changes her position in her reply brief, arguing that "[i]t is unclear whether [she] was taking Abilify at the time of her evaluation and if not, whether Dr. Ewing was aware." ECF No. 16 at 2. Even assuming plaintiff was taking Abilify, Dr. Ewing's report makes clear that plaintiff was not taking her Lithium, a drug that provided substantial benefit to plaintiff. Thus, even assuming plaintiff was taking Abilify at the time of the evaluation, that fact does not undermine the ALJ's basis for rejecting Dr. Ewing's opinion.

The ALJ also properly noted that plaintiff misreported her work history to Dr. Ewing. In his report, Dr. Ewing stated that plaintiff was last employed in 2009 as a health care aid for an eight-month period. AR 391. Plaintiff reported that she was fired from that job "because of my attitude because I went off on somebody." *Id*. As observed by the ALJ, the record actually establishes that plaintiff worked in 2011, 2012, and 2013.[6] *Id*. at 26, 222, 226, 233. The ALJ reasonably concluded that plaintiff's misrepresentation would have given Dr. Ewing the impression that plaintiff was more impaired than she actually was.[7] AR 26; *see Marci*, 93 F.3d at 544; *Tommasetti*, 533 F.3d at 1038. Plaintiff's inaccurate representation that she had not worked since 2009 created the false impression that even with treatment she remained unable to maintain employment.

Plaintiff contends that notwithstanding her misrepresentation, Dr. Ewing was aware that she worked at least until 2011 because he reviewed a copy of her "SSA form 3386,"[8] which included plaintiff's work history. ECF No. 11 at 13. Although Dr. Ewing's report indicates that he reviewed that form, he apparently failed to take notice of the form's description of plaintiff's work history. In his report, Dr. Ewing described plaintiff's work history as limited and infrequent and noted that she last worked in 2009. AR 391. Plaintiff's SSA form 3368 actually reports that she worked as a cashier from 2002 to 2011, a caregiver from 2006 to 2011, and a childcare provider for about 5 months in 2011. AR 239. Plaintiff's own description in that report contrasts sharply with Dr. Ewing's description of plaintiff's work history as limited and infrequent. Accordingly, the record does not establish that Dr. Ewing was aware that plaintiff had worked until at least 2011.

/////

---

[6] Plaintiff also had $575.25 in earnings for 2010. AR 233.

[7] Plaintiff also reported to Dr. Ewing that she first received mental health treatment in 2011, despite a long history of mental health problems.

[8] Dr. Ewing appears to have transposed the last two digits of the form number. Presumably, he intended to write SSA form 3368, which is a disability report that includes a claimant's work history.

13

Lastly, the ALJ also properly observed that Dr. Ewing's opinion was based on a one-time evaluation. While that finding alone would not justify the rejection of an examining opinion, the number of times a physician examines the claimant is a relevant and appropriate consideration in combination with the record as a whole for assessing what weight to give the opinion. 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i). In this case, it is particularly relevant given that plaintiff was not on her medication on the one occasion Dr. Ewing evaluated plaintiff.

Accordingly, the ALJ provided specific and legitimate reasons for his rejection of Dr. Ewing's opinion in favor of treating records from El Hogar clinic, including the observations of Dr. Gordon and Nurse Practitioner Castillo.

### B. The ALJ Did Not Err in Assessing Plaintiff's Testimony and Third-Party Statements

#### 1. Relevant Legal Standards

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc). If there is objective medical evidence of impairment, the ALJ may then consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions. *See id.* at 345-347. The ALJ also may consider: (1) the applicant's reputation for truthfulness, prior inconsistent statements or other inconsistent testimony, (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and (3) the applicant's daily activities. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). Work records, physician and third party testimony about nature, severity and effect of symptoms, and inconsistencies between testimony and conduct also may be relevant. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). A failure to seek treatment for an allegedly debilitating medical problem may be a valid consideration by the ALJ in determining whether the alleged associated pain is not a significant nonexertional impairment. *See Flaten v. Secretary of HHS*, 44 F.3d 1453, 1464 (9th Cir. 1995). The ALJ may rely, in part, on his or her own observations, *see Quang Van Han v. Bowen*, 882 F.2d 1453, 1458 (9th Cir.

1989), which cannot substitute for medical diagnosis. *Marcia v. Sullivan*, 900 F.2d 172, 177 n. 6 (9th Cir. 1990). "Without affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing." *Morgan*, 169 F.3d at 599.

### 2. Background

At the administrative hearing, plaintiff testified that she continuously worked from the age of 14 up until 3 years prior to the hearing. AR 39. She also reported working for a couple months as an in-home care provider for her father in 2013. *Id*. That last job entailed helping her father with his daily activities, helping him get out of bed, cleaning his room, administering medication and preventing him from drinking alcohol. *Id*. at 39-40. She also testified that she lives with her seven-year-old child, but does not participate in many of her son's activities. AR 45-46. Her son's father takes the child to school and to his extracurricular activities, including playing basketball. Plaintiff stated that she was unable to attend her son's basketball games because she "can't make it out the door." *Id*. at 47.

Plaintiff claimed that she is unable to work because being around other people makes her angry. AR 42, 48. She reported that when she was working, she "always had an issue with somebody." *Id*. at 48. She further testified that when she is around people, she sometimes feels devastated or depressed and feels like she can't breathe. *Id*.

Plaintiff also made similar representations in her functional report. *Id*. at 274-281. She reported that being around people makes her angry and that she gets really intense when talking to others. *Id*. at 274, 279. She also reported difficulty sleeping, stating that she will wake up multiple times in the middle of the night to make sure her door is locked. *Id*. at 275. In regards to activities of daily living, she cares for her son, prepares simple meals, cleans and does laundry, and shops once a month for approximately 2 hours. *Id*. at 275-77.

The ALJ found that plaintiff's testimony was not fully credible. AR 26. In making this finding, the ALJ observed that plaintiff had not followed her prescribed course of treatment and had made inconsistent statements regarding her work history. *Id*.

/////

### 3. Discussion

The ALJ's reasons for rejecting plaintiff's testimony were clear, convincing, and supported by substantial evidence. First, the ALJ discounted plaintiff's allegations regarding the severity of her impairments due to plaintiff's failure to follow her mental health providers prescribed course of treatment. An ALJ is permitted to consider an unexplained or inadequate explanation for failing to follow a prescribed course of treatment in assessing a plaintiff's credibility. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *see Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (holding that where a claimant complains of disabling pain but fails to seek treatment, or fails to follow prescribed treatment, an ALJ may use such failure as a basis for finding the complaint unjust or exaggerated).

The record is replete of examples of plaintiff failing to take her medication as prescribed by her physicians. In March 2012, Dr. Yen increased plaintiff's prescription of Trileptal due to persistent mood symptoms (AR 348), but at the following appointment plaintiff admitted that she did not increase her medication due to fear of a potential side effect (*id*. at 369). After discussing her concerns with Dr. Yen, plaintiff agreed that she would increase her Trileptal (*id*), but again failed to do so (*id*. at 368). Because of plaintiff's failure to follow her instruction, Dr. Yen switched plaintiff to Lithium. *Id*. However, it was noted at the following appointment that plaintiff "[a]gain failed to pick up medication" and that her main limitation was her failure to follow instructions. *Id*. at 367.

Similar issues are documented in plaintiff's 2013 and 2014 treatment records from El Hogar clinic. Plaintiff was prescribed Zoloft in August 2013 (*id*. at 62), but she reported in February 2014 that she had "been using lithium" because she ran out of Zoloft (*id*. at 360). In June 2014, plaintiff self-discontinued all medications. *Id*. at 383. Although plaintiff subsequently resumed taking her medications, it was noted in August 2014 that she self-discontinued her Abilify. *Id*. at 385. Plaintiff also testified at the hearing that she had been off her Lithium the prior four days. *Id*.

In addition to her frequent failure to take her medication, she consistently failed to have her blood work performed. At virtually every medical appointment, plaintiff was directed to have

lab work performed, *see id*. at 346-48; 360-63, 367-69, 382-86, yet there is no indication that she ever had any lab work performed. Instead, a June 2014 treatment note reflects that there was no lab work in her file. *Id*. at 383. Further, plaintiff's treating physician also recommended plaintiff participate in groups for bipolar therapy and chemical dependency, but there is no indication that plaintiff followed that recommendation.

Plaintiff also frequently missed her appointments or failed to make follow-up appointments as directed by her health care providers. There are also substantial gaps in her mental health treatment record. After her February 11, 2012 appointment, plaintiff was instructed to follow up in 10 days. *Id*. at 346. She was not seen, however, until March 6, 2012. *Id*. at 347. After her May 15, 2012 appointment, plaintiff was directed to follow up in 3 weeks and to think carefully about scheduling the appointment on a date she believed she could make due to her failure to keep prior appointments. *Id*. at 368. Plaintiff, however, was not seen again until July 2, 2012. *Id*. at 367. At that time, Dr. Yen instructed plaintiff to follow up in two weeks (*id*.), but there are no further records from that health care provider. Instead, plaintiff's next treatment record is from August 2013, more than a year later. *Id*. at 362. After that appointment, plaintiff was instructed to follow up in 4-6 weeks (*id*.), but she was not seen again until February 8, 2014 (*id*. at 360). Plaintiff did make an appointment for February 4, but she failed to keep that appointment. *Id*. at 366. Plaintiff was instructed to return in March (*id*. at 360), but was not seen until April. *Id*. at 361. After discontinuing her medication and presenting with manic behavior at her June 6 appointment, plaintiff was instructed to return in five days after having labs completed. *Id*. at 383. Although plaintiff made an appointment for June 10, 2014, she failed to keep that appointment (*id*. at 388) and was not seen until July 7 (*id*. at 384). Plaintiff was subsequently evaluated in August 2014, at which time she was directed to schedule an appointment in a month. *Id*. at 385. The record, however, does not contain any medical records from after that appointment.

Accordingly, substantial evidence supports the ALJ finding that plaintiff failed to follow her physicians' prescribed course of treatment.

/////

Although plaintiff argues that the ALJ failed to consider that her impairments interfered with her ability to obtain persistent treatment, ECF No. 11 at 17, the record does not support that contention. Plaintiff asserts that her treatment records indicate that her symptoms prevented her from "regularly attending appts, and engaging with service providers." *Id*. at 17-18 (quoting AR 364). But this contention is belied by other evidence in the record. Plaintiff testified that the county drug court required her to participate in Narcotics Anonymous ("NA"), which required her to frequently attend group classes and her functional report indicates that she attended classes every other day. AR 274 and 44. Although she reported feeling anxiety due to being around other people during her classes (*id*. at 274), she testified that she was able to complete the two-year program (*id*. at 44). Her ability to regularly attend NA classes despite her mental impairments contradicts her contention that her mental impairments precluded her from keeping her medical appointments. Plaintiff also testified that the drug court required her to be drug tested, *id*. at 44-45, which suggests that plaintiff could have obtained lab work despite her mental condition.

Plaintiff's explanation for failing to take her medication as directed is also problematic. The record does not support her contention that she had to stop taking her medication due to side effects. On only one occasion did plaintiff report that she stopped taking her medication (Abilify) due to side effects. *Id*. at 385. The record contains numerous instances of plaintiff failing to take her medication without explanation. Plaintiff was started on Lithium in May 2012. *Id*. at 368. However, it was noted at her next appointment that she failed to pick up her medication. *Id*. at 367. Significantly, it was noted that plaintiff denied any resistance or fear of the medication. *Id*. She was prescribed Zoloft in August 2013 (*id*. at 362), but it was noted in February 2014 that she had run out of the medication (*id*. at 360). And in June 2014, plaintiff self-discontinued all medications based on her contention that "they don't work" and not due to any side effect.

Accordingly, the ALJ properly considered plaintiff's failure to follow her physicians' recommended course of treatment, as well as plaintiff's explanations for that failure, in ultimately discounting as not credible plaintiff's testimony regarding her work limitations .

/////

The ALJ also properly considered plaintiff's inconsistent statements regarding her work history. Evidence in the record shows that plaintiff had 2012 earnings that exceeded $7,300. *Id*. at 232. Yet plaintiff stated in her work history report that she last worked in 2011, *id*. at 258, and she testified at the November 2014 hearing that she consistently worked "until probably about three year ago," which would have been approximately November 2011. *Id*. at 39. She both denies the discrepancy and minimizes its importance.

Plaintiff argues that she did not misrepresent her work history because "[s]he wasn't asked and didn't specifically deny working in 2012. On the contrary, her testimony regarding her work was vague and unspecific." ECF No. 11 at 17. Plaintiff's argument, however, ignores the fact that she specifically represented in her work history report that she last worked in 2011. *See* AR 258. Her omission is significant given her claim that she became disabled as of January 31, 2012. *Id*. at 205. Moreover, it was plaintiff's responsibility to submit accurate information regarding her work history. *See* 20 C.F.R. § 404.1512(a)(iii) (it is the claimant's responsibility to prove disability and to submit information about her work history). Thus, it is clear from the record that plaintiff worked in 2012, but withheld that information. *See Smolen*, 80 F.3d at 1284 (finding that an ALJ may rely on inconsistencies in assessing a claimant's credibility).

Lastly, plaintiff argues that the ALJ failed to provide sufficient reasons for finding that statements from plaintiff's mother and sister were not entirely credible. ECF No. 11 at 18. Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). An ALJ must consider this testimony in determining whether a claimant can work. *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006); *see also* 20 C.F.R. § 416.913(d)(4); *Smolen*, 80 F.3d at 1288. However, in doing so the ALJ is free to evaluate that testimony and determine the appropriate weight it should be given in the light of the other evidence. To discount the testimony of a lay witness, the ALJ must "give reasons that are germane to each witness." *Id*. at 1053; *see also Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009).

/////

The ALJ specifically addressed the statements provided by plaintiff's sister and mother. The ALJ observed that those statements largely mirror plaintiff's statements that she had difficulty functioning and being around other people. AR 26, 61-68, 285-92. The ALJ concluded that these statements, like plaintiff's own subjective reports, were not consistent and lacked corroborating objective medical evidence of record. *Id*. at 26. Thus, the ALJ concluded that statements from plaintiff's sister and mother were substantially similar to plaintiff's testimony, and rejected their statements for the same reason he rejected plaintiff's testimony. In doing so, the ALJ properly took account of the evidence in the record indicating that plaintiff's symptoms improved with medication compliance. The problem, however, is that she rarely takes her medication as directed. "[I]f the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness. *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012); *see also Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009) (where clear and convincing reasons given for rejecting subjective complaints of plaintiff and third party testimony mirrors plaintiff's, germane reasons given for rejecting third party evidence). Thus, plaintiff's failure to follow her prescribed course of treatment not only served as an adequate basis to reject her testimony, but is also a germane reasons for discounting her sister and mother's statements.

IV. Conclusion

Accordingly, it is hereby ORDERED that:

1. Plaintiff's motion for summary judgment (ECF No. 11, 14) is denied;

2. The Commissioner's cross-motion for summary judgment (ECF No. 15) is granted; and

3. The Clerk is directed to enter judgment in the Commissioner's favor and close the case.

DATED: March 29, 2018.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

20